NEW ENGLAND CAR CO. (DAY v.). See Case No. 3,686.

NEW ENGLAND CAR-SPRING CO. (DAY v.). See Cases Nos. 3,687 and 3,688.

---

## Case No. 10,153.

NEW ENGLAND CAR-SPRING CO. et al. v. UNION INDIA RUBBER CO. et al.

[4 Blatchf. 1.] [1]

Circuit Court, S. D. New York. March 30, 1857.

CORPORATIONS—PAYMENT TO TREASURER—NEGLECT OF DUTY BY AGENT AS A DEFENSE—NOTICE TO TREASURER—WAIVER—ESTOPPEL.

1. The treasurer of a corporation, who is held out to the world as the proper agent to whom a payment to the corporation is to be made, is the proper agent to whom notice is to be given as to the purpose for which the payment is made.

2. Circumstances stated, under which a corporation is not permitted to set up a neglect of duty by its agent, to show its want of knowledge of facts the knowledge of which was communicated to its agent.

3. Where a notice is required to be given to a corporation, it is sufficient to give such notice to its treasurer and managing agent, at its office; and it is not necessary to give it to the directors of the corporation, when assembled for the transaction of business.

4. A corporation can waive a right, and can be estopped from saying that it has not waived it.

5. The doctrine of estoppel considered, in reference to a corporation which receives, through its agent, a portion of the consideration money for the sale of property in which it is interested, and afterwards endeavors to prevent the full operation of such sale.

In equity. This was an application for a provisional injunction, to restrain the infringement of letters patent [No. 3,633] granted to Charles Goodyear, June 15th, 1844, for what is known as "vulcanized India rubber" [reissued December 25, 1849, No. 156]. The New England Car-Spring Company claimed the exclusive right to make car-springs under the patent, by license from Goodyear, and the bill alleged that the defendants were making car-springs of vulcanized India rubber without right. The defendants claimed a right to make such car-springs by license from Goodyear under the patent. On the 18th of July, 1844, Goodyear entered into an agreement with the Naugatuck India Rubber Company, by which he gave a license to that company, to use, with a few exceptions, the whole right granted by the patent, upon certain terms. By that agreement, Goodyear covenanted not

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

to license any other person, reserving, however, to himself, provided he should deem it for his interest to sell the exclusive right for any particular subject of manufacture under the patent, the right so to do, for a sum in gross, provided, that, before any such sale for a sum in gross, the Naugatuck Company should have the right to become the purchasers, at such stipulated price or sum in gross; and such sale was not to be made to any other person, except on the refusal or neglect of the Naugatuck Company, for sixty days after the offer should have been made to them, to become the purchasers for such sum in gross, nor then, until one-fourth of the stipulated sum in gross should be first paid or secured to the company, to their satisfaction; and, upon such sale, the license to the company, to the extent of the exclusive right sold, was to cease. This agreement was recorded in the patent office. On the 29th day of October, 1847, Goodyear, for the consideration of $5,000, sold to Charles Ely and Edward Crane the exclusive right to use his patented invention in the making of car-springs. The transfer was in writing, and was recorded in the patent office January 10th, 1848. At the time of such transfer to Ely and Crane, the factory of the Naugatuck Company was at Naugatuck, in Connecticut, and all the directors, except Charles J. Gilbert, lived at Hartford, in that state. The company had an office for the transaction of business in the city of New York, where Charles J. Gilbert attended, he being the treasurer of the company. On the 26th of December, 1848, Ely and Crane assigned to the New England Car Company all the right which they acquired by the conveyance from Goodyear to them, of the 29th of October, 1847; and, on the 20th of November, 1851, the last-mentioned company assigned all such right to the plaintiffs, the New England Car-Spring Company. Both of these assignments were duly recorded in the patent office. On the 4th of November, 1848, the Naugatuck Company assigned all the right which they then had, by virtue of their contract with Goodyear, of the 18th of July, 1844, to the defendants, the Union India Rubber Company, they agreeing to perform all the covenants which the Naugatuck Company were bound to perform by virtue of their agreement with Goodyear of that date.

James T. Brady and Edward N. Dickerson, for plaintiffs.

William Curtis Noyes and George C. Goddard, for defendants.

INGERSOLL, District Judge. If the contract between Goodyear and Ely and Crane was a valid contract to convey what it purported to convey, then, from and after its date, the Naugatuck Company had no right to manufacture car-springs under the patent; and, consequently, no such right was conveyed by them to the defendants. If the contract between Goodyear and Ely and Crane did not convey what it purported to

convey, then the Naugatuck Company, subsequently to that contract, had the same right which they had before. And as, before such contract, they had a right to make car-springs under the patent, it would follow that the defendants would now have the same right to make such car-springs, as. on the 4th of November, 1848, they succeeded to the rights which the Naugatuck Company then had. The plaintiffs insist, that the contract between Goodyear and Ely and Crane was a valid contract, and that it conveyed the exclusive right to make car-springs of vulcanized rubber under the patent.

It is clear that Goodyear, after the contract with the Naugatuck Company, had no absolute unconditional right to convey to Ely and Crane what his contract with them purported to convey. The Naugatuck Company had rights, which were inconsistent with such absolute unconditional right. Their rights could not be affected at the mere will of Goodyear. Before their agreement with Goodyear, he could sell to whom he pleased, and for such sum as he pleased, the exclusive right to manufacture car-springs of vulcanized rubber. And, after such agreement, he could sell to any third person such exclusive right, upon any terms agreed upon, provided the Naugatuck Company assented to the same. Whatever restriction was imposed by the agreement, upon his right to sell, was so imposed for the benefit of the Naugatuck Company. They could, by their assent, remove the restriction, and, upon such assent being given, the right to sell existed, although the conditions mentioned in the agreement were not complied with. He had, also, a right to sell without the assent of the Naugatuck Company, provided that, upon an agreement to sell for a sum in gross, the company should either refuse or neglect, for sixty days after notice given to them to become the purchasers, to avail themselves of the privilege; and provided, also, that, upon such neglect or refusal, one-fourth of the stipulated sum or price in gross should be tendered to them. If the company assented to a sale, then these conditions need not be complied with. If these conditions were performed, then there was no necessity to obtain the assent of the company. In such a case, a sale would be valid, even if they should dissent. If, therefore, the Naugatuck Company assented to this sale of Goodyear to Ely and Crane, or if, before the sale, the conditions above set forth were performed, the Naugatuck Company would be divested of all right to manufacture car-springs under the patent, and the exclusive right to manufacture them would be vested in Ely and Crane. And, as the New England Car-Spring Company now have all the right which Ely and Crane derived from Goodyear, the exclusive right would be vested in them.

Two questions, therefore, are presented for determination: First, did the Naugatuck Company assent to the contract of sale, as made by Goodyear to Ely and Crane? and, second, were the conditions mentioned in the contract between them and Goodyear, and which were necessary to be performed, to give him a right to sell, complied with by him, before the contract of sale to Ely and Crane was executed? If either of these questions is answered in the affirmative, then the contract of sale to Ely and Crane was a valid one, and conveyed an exclusive right to them to manufacture car-springs under the patent; and, as a consequence, the right of the Naugatuck Company, under the license of Goodyear, to manufacture such springs, ceased.

The facts upon which the question of assent is to be determined, admit of little dispute. Five thousand dollars was paid by Ely and Crane for the transfer of the car-spring right to them. One thousand dollars of this sum was paid to a Mr. Dorr, as a commission for negotiating the purchase. On the 4th of November, 1847, Dorr delivered to Gilbert, the treasurer of the Naugatuck Company, for that company, $1,000, in a draft drawn by Charles Ely on Edward Crane, for that company's share of the purchase-money, according to that agreement of the 18th of July, 1844. The transaction was entered on the books of that company. The draft was discounted for the benefit of that company. It was paid at maturity. They received the money. It was appropriated to their use. They took advantage of the contract made between Goodyear and Ely and Crane. They received the consideration money paid by Ely and Crane to cancel the right which before then existed in them. They received the proceeds of the sale of their right, as made by Goodyear. They have kept those proceeds. They never offered to return them. They never in any way repudiated the act of their treasurer, either in receiving the draft, or in procuring it to be discounted, or in applying the avails to their benefit. The money which Ely and Crane paid, $1,000 of which the Naugatuck Company received, was paid and received in consideration that the car-spring right should exclusively vest in Ely and Crane, and in consideration that the license to the Naugatuck Company to make car-springs should cease. The Naugatuck Company never attempted to make car-springs. The transaction in relation to this payment was entered on the books of that company, which books were at all times open to the inspection of its directors. The books show that the "patent account" was credited, and "bills receivable" debited, with the draft. On the 9th of February, 1848, "bills receivable" was credited, and "cash" debited, with the money received on the discount of the draft. It cannot be denied that Gilbert, the treasurer, knew for what purpose the draft was delivered to him, or that he received it for the purpose for which it was delivered.

But it is claimed by the defendants, that, although this $1,000 draft was delivered to

Gilbert, their treasurer, as the consideration that Ely and Crane should have the exclusive right to manufacture car-springs under the patent, and that the Naugatuck Company's right to manufacture such springs, under the license from Goodyear, should cease, and although Gilbert knew of the purpose for which the money was paid, and received it for the purpose for which it was paid, and applied it to the company's use, yet the corporation had no knowledge of the purpose for which the draft was delivered to the treasurer, and did not know that it was the consideration paid to enable Goodyear to transfer an exclusive right to manufacture car-springs, and no notice to that effect was given to it, and, therefore, it should not be presumed to have assented to such transfer.

A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. The only mode to give notice, or to communicate knowledge, to such artificial being, invisible and intangible, is to give such notice, and to communicate such knowledge, to some agent authorized to receive it. Corporations know nothing except through agents. They act by agents. They receive notice through agents. The neglect of agents is their neglect. The directors are no more the corporation than the treasurer is. They are merely the agents of the corporation, when assembled for the transaction of business. Gilbert was the proper agent of the corporation to receive funds paid to them. When the corporation appointed him treasurer, it held him out to the world as the proper agent for that purpose. As he was the proper agent to whom a payment should be made, it necessarily follows that he was the proper agent to whom knowledge should be communicated for what purpose such payment was made. Every agent authorized to receive money for his principal is the proper person to whom, when a payment is made, notice should be given for what purpose the payment is made. It is a principle of law, that, where a debtor owes two separate debts to the same creditor, and makes a partial payment, if he gives notice, at the time of payment, upon what debt the payment is to apply, it must be applied on such debt; and, if he gives no such notice, the creditor has a right to apply the payment on what debt he pleases. If an incorporated bank holds two notes against an individual, one of which is abundantly secured, and the debtor makes a partial payment, and, at the time of payment, notifies the cashier of the bank that the money is to apply on the note that is secured, it cannot be claimed that the bank has a right to apply the money on the note that is not secured, upon the ground that no notice was given to the corporation on what note the debtor wished the payment to apply.

It appears, on the books of the corporation, that a draft, drawn by Charles Ely on Edward Crane, for $1,000, was received, and that the "patent account" was credited with that draft. It is to be presumed that the directors did their duty. If they were attentive to their duty, the corporation, through its agents the directors, knew for what purpose the draft was received. Knowing this purpose, and not objecting to it, through any of its agents, but, through its agents, appropriating the money to its use, it ratified the receipt of the money for the purpose for which it was received, and assented to such purpose. The entry on the books fully apprised the corporation that the $1,000 draft was paid and received on the "patent account." It also apprised the directors. By inquiry, the directors could have ascertained for what particular reasons this $1,000 draft was credited to the "patent account." It was the duty of the corporation, through its agents, the directors, to make such inquiry. It is to be presumed that the directors performed this duty. It is to be presumed, therefore, that the corporation knew that the draft was received to enable Goodyear, by a transfer to Ely and Crane, to take from the company the right to manufacture car-springs. And, knowing the purpose for which the money was paid and received, the corporation, by not objecting, approved of it, and thereby assented that that purpose should be accomplished. If the directors, by a neglect of their duty, were ignorant of this entry on the books, and of the purpose for which the draft was received, the corporation cannot set up such neglect of duty in its agents, to show that it had no knowledge of the transaction as it actually was.

From these facts it is clear, that the Naugatuck Company assented to the contract of sale made by Goodyear to Ely and Crane. If they did not assent, they committed a fraud, not only on Goodyear, but also on Ely and Crane; and it is not to be presumed that they were guilty of any such fraud. He who does not dissent, when it is his duty so to do, if he ever intends to, thereby assents. If the owner of goods stands by, and knowingly sees a stranger sell his property, and does not dissent, he thereby assents to the transfer. He who receives the consideration money paid to have a particular act performed, thereby assents that such act shall be performed.

In July, 1847, Goodyear deemed it for his interest to sell, for the sum of $5,000, the right to manufacture car-springs under the patent. He had an opportunity so to do. Sometime during that month, he gave notice to Gilbert, the treasurer of the Naugatuck Company, and who had also the general management of its business, at a yearly salary of $2,000 of his wish and intention. That corporation, for more than sixty days after such notice to Gilbert, neglected to become the purchaser of such right to manufacture car-springs. The sixty days having elapsed, the draft of Ely on Crane for $1,000 was delivered to Gilbert, as treasurer of the company, for the company, on the 4th of November, 1847, for their share of the sum for which

Goodyear had agreed to sell the right, according to the agreement of July 18th, 1844, and Goodyear made the transfer to Ely and Crane, purporting to convey to them the whole of the car-spring right. In regard to these facts, there can be no serious doubt. But it is claimed by the defendants that they are not sufficient to show that the conditions in the contract of July 18th, 1844, to be performed by Goodyear, before he could sell and transfer the car-spring right, were complied with.

The notice which Goodyear sent to the Naugatuck Company was not in writing. There was no necessity that it should be in writing. The contract of July 18th, 1844, did not require that it should be in writing. The notice was to be given to the corporation. But a notice given to a proper agent of a corporation, is notice to the corporation. There is no way to give notice to a corporation, but to give it to a proper agent of the corporation. It can be given in no other mode. The defendants claim that the treasurer, who was also the managing agent, was not the proper agent to whom the notice should have been given, and that it should have been given to the directors, when assembled for the transaction of business. As has been already shown, the directors were not the corporation. They were only the agents of the corporation, when they were assembled for the transaction of business. And the records show that they had no regular place of meeting, or any regular time of meeting. They met in such place and at such time as was convenient to them. They had a meeting on the 30th of December, 1846. The next meeting was on the 19th of May, 1847; the next, on the 14th of July, 1847; the next, on the 16th of September, 1847; and the next, on the 28th of October, 1847. Their meetings were held sometimes at Hartford, sometimes at Naugatuck, and sometimes at New York. Goodyear had a right, by the contract of July 18th, 1844, to give, at any time, the notice required. That right of giving notice at any time, he could not exercise, if it were required of him to give notice to the directors when assembled for the transaction of business. He had no means of knowing when they assembled, or where they assembled. And, according to the claim made, if they should never assemble, or if they should keep the time and place of their assembling a secret, no notice could be given at all; and the consequence would be, that this right of sale, which Goodyear reserved, upon certain conditions to be performed, could never be exercised. There is a provision in the contract of July 18th, 1844, that if, for the period of one year, the Naugatuck Company shall neglect or refuse to stamp the goods manufactured, with the name of Goodyear, in disregard of his written remonstrance to the company, the license shall, at the expiration of the year, become void. According to the claim of the defendants, if such neglect should take place, and there should be no meeting of the directors, no such written remonstrance could be given. Such a construction would put it in the power of the corporation, through its agents, the directors, to abrogate all the rights which Goodyear reserved to himself in the contract.

The corporation had an office for the transaction of its business in the city of New York, established there by the vote of the company. The factory was at Naugatuck. Gilbert, the treasurer, attended, at the office in New York, to the business of the company, at a yearly salary of $2,000. There was no other agent of the corporation at that office. The directors had no particular office or place where they assembled to attend to the business of the corporation. Gilbert had the general superintendence of the business of the corporation. That appears on the records of the corporation, in a report made by him to the company, and accepted by them. The notice was given to him at the office of the company, where there was no other agent; and such notice to such agent was a notice to the corporation.

Upon such notice, it was not required that the corporation should do any act, either by vote or otherwise, to enable Goodyear to sell. All that was necessary was, that they should neglect to act—that they should neglect to make the purchase. When the sale was made by Goodyear to Ely and Crane, more than sixty days had elapsed from the time the notice was given. Five thousand dollars was the consideration of the sale. It was made on the 29th of October, 1847. One thousand dollars was allowed to Dorr, for a commission for negotiating the purchase. Of the remaining $4,000, $1,000 was paid to the Naugatuck Company, on the 4th of November, 1847, for their portion. They received it as their portion, and never made any objection to it. And, if in the latter two particulars, the conditions of the contract of July 18th, 1844, were not strictly complied with, it was because the company did not require a strict compliance. They waived such strict compliance. The conditions in the contract were for their benefit, and they could waive the right to insist upon a strict compliance with them. By the various acts which have already been enumerated, they did waive such right, and having so waived such right, such waiver must have the same effect as if the conditions had been strictly complied with.

The necessities of the case do not require a resort to the doctrine of estoppel, to come to a right determination. If they did, such resort would confirm the justness of the plaintiffs' claim. Corporations, as well as individuals, can be estopped from denying that they have done certain acts, when they had the corporate power to do such acts. They have the power to waive rights and conditions in their favor, to transfer rights and privileges, and to assent to such transfer by others;

and, therefore, they can be estopped from saying that they have not so done. Where one, by his words or actions, intentionally causes another to believe in the existence of a certain state of things, and thereby induces him to act on that belief, so as injuriously to affect his previous position, he is precluded from averring a different state of things, as existing at the time. Cowles v. Bacon, 21 Conn., 451; Brown v. Wheeler, 17 Conn. 345, 355; Roe v. Jerome, 18 Conn. 138, 153; Carpenter v. Stilwell, 12 Barb. 128. Where a party, negligently or wilfully, silently stands by, and allows another to contract, on the faith and understanding of a fact, which he can contradict, he cannot afterwards contradict that fact, as against the person who may be injured thereby. Gregg v. Wells, 10 Adol. & E. 90; Watson v. McLaren, 19 Wend. 557, 563; Dezell v. Odell, 3 Hill, 215; Reynolds v. Lounsbury, 6 Hill, 534, 536; Sanderson v. Collman, 4 Man. & G. 209; Welland Canal Co. v. Hathaway, 8 Wend. 480, 483; Bushnell v. Church, 15 Conn. 406, 419. If he stands by and sees his property sold, without objecting to it, he is estopped from saying that the party selling had no right to sell; and this even when he derives no benefit from the sale, and especially when he receives and keeps the consideration money derived from it. In such a case, it is his duty to speak and make known his rights to the purchaser, if he does not intend to be bound by the sale; and, if he is silent, when conscience requires him to speak, equity will debar him from speaking, when conscience requires him to be silent. Hall v. Fisher, 9 Barb. 17.

It is not necessary to examine many particular cases to sustain these rules. In the case of Zulueta v. Tyrie, 21 Eng. Law & Eq. 582, A., a merchant in Cuba, sold to B. part of a cargo shipped by him. C., (who was A.'s correspondent in England,) being informed thereof by B., made no claim until four months afterwards, when he insisted on a paramount right, over B., to the cargo. It was held, that, even assuming that he had originally such paramount right, his conduct had been such, that a court of equity would not allow him to enforce it against B. The case of Wing v. Harvey, 27 Eng. Law & Eq. 140, was an action on a policy of insurance issued by the Norwich Union Society for the Insurance of Lives, on the life of one Bennett. There was an express condition in the policy, that it should be forfeited and become void, in case the assured went, without the license of the directors, beyond the limits of Europe. He did, without such license, go to Canada, where he resided several years, and there died. After the forfeiture, premiums were paid, from time to time, to a local agent, who knew of the residence of the assured in Canada, upon the faith that the policy continued valid and effectual. These premiums were transmitted to the directors, who retained them without objection. It was held, that though the local agent might not

have given notice to the directors, of the true state of the circumstances under which the premiums were paid, the directors became as much bound as if the premiums had been paid by the assured directly to them, with full knowledge of such circumstances; that the directors, by taking the money, were precluded and estopped from saying they received it otherwise than for the purpose for which it was paid to the agent; and that that for which the money was paid should be executed. He who takes the benefit of any contract or deed must bear the burthens of such contract or deed. If he knowingly accepts a part of the purchase money for a sale of property, he is estopped from denying the validity of the sale. Stroble v. Smith, 8 Watts, 280; Brewster v. Baker, 16 Barb. 613. If a person accepts a beneficial interest under a will, he thereby debars himself from setting up a claim which will prevent its full operation. Weeks v. Patten, 18 Me. 42; Hyde v. Baldwin, 17 Pick. 303; Thellusson v. Woodford, 13 Ves. 209. Apply this principle to the case now under consideration. The Naugatuck Company accepted and received a beneficial interest in the contract between Goodyear and Ely and Crane, to wit, $1000, a part of the consideration for the sale of the exclusive right to manufacture car-springs. They would be estopped, therefore, from setting up any claim to prevent the full operation of the sale of such exclusive right.

There are other considerations presented by the plaintiffs, to show that the exclusive right to manufacture car-springs was in the New England Car-Spring Company; as that, when the sale was made by the Naugatuck Company to the Union India Rubber Company, the agent of the latter company, who procured the purchase to be made, and, who on their part, executed the contract, had full knowledge that no right existed in the Naugatuck Company to manufacture car-springs, and that no such right was intended to be purchased by the Union Company; as that the defendants have, at all times, until within a few months past, acquiesced in the exclusive right of the New England Car-Spring Company; as that the Union Company applied to the New England Car-Spring Company for liberty to make car-springs for them, and, on condition that they might so manufacture, covenanted not to make springs for other parties in interference with the rights of the New England Car-Spring Company, as granted to said company by Charles Goodyear; as that the Union Company have never stamped the car-springs manufactured by them, with the words "Goodyear's Patent;" and have never paid or offered to pay any tariff, which they were bound to do, if they were manufacturing by virtue of any right derived from the Naugatuck Company; and as that the exclusive right of the plaintiffs has been established in various trials at law. But it is not necessary to examine the force of any of these considerations. The

points considered show that the exclusive right claimed by the New England Car-Spring Company is clear, and that the violation of right on the part of the defendants is equally clear. An injunction must, therefore, issue, as prayed for.

[For other cases involving this patent, see Goodyear v. Central R. Co. of N. J., Case No. 5,563, and Goodyear v. Union India Rubber Co., Id. 5,586.]